# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**DAVID A. STICH**
                **Plaintiff,**

      **v.**                                                **Case No. 09-C-0483**

**MICHAEL J. ASTRUE,**
**Commissioner of the Social Security Administration**
                        **Defendant.**

---

## DECISION AND ORDER

Plaintiff David Stich[1] applied for social security disability benefits, claiming that he could no longer work due to back and abdominal pain and mental impairments. The Social Security Administration ("SSA") denied the application initially (Tr. at 55; 56; 58; 62; 778) and on reconsideration (Tr. at 57; 67; 783; 779), as did an Administrative Law Judge ("ALJ) after a hearing (Tr. at 23-33). Plaintiff submitted additional evidence to the SSA's Appeals Council, but the Council denied review (Tr. at 6; 9),[2] making the ALJ's decision the agency's final ruling on the application. See Nelms v. Astrue, 553 F.3d 1093, 1097 (7th Cir. 2009). Plaintiff now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).

## I. APPLICABLE LEGAL STANDARDS

### A. Judicial Review

Judicial review under § 405(g) is limited; the court will reverse only if the ALJ's decision

---

[1]In the complaint, plaintiff's surname is spelled "Stitch," and the court's docket spells it that way. However, in their briefs, the parties spell his name "Stich," as it appears in the record from the SSA. I use the latter spelling.

[2]The record does not contain the Council's actual decision but does include letters from the Council referencing the denial.

is not supported by substantial evidence, is based on legal error, or is so poorly articulated as to prevent meaningful review. Hopgood ex rel. L.G. v. Astrue, 578 F.3d 696, 698 (7th Cir. 2009). Substantial evidence is such relevant evidence as a reasonable person might accept as adequate to support a conclusion. Terry v. Astrue, 580 F.3d 471, 475 (7th Cir. 2009). Thus, if conflicting evidence in the record would allow reasonable people to differ as to whether the claimant is disabled, the ALJ's decision to deny the application must be upheld. Elder v. Astrue, 529 F.3d 408, 413 (7th Cir. 2008). The court must review the entire record, including both the evidence that supports as well as evidence that detracts from the ALJ's conclusions, but it may not displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations. Simila v. Astrue, 573 F.3d 503, 513 (7th Cir. 2009). In sum, the court will uphold a decision so long as the record reasonably supports it and the ALJ explains his analysis of the evidence with enough detail and clarity to permit meaningful review. Eichstadt v. Astrue, 534 F.3d 663, 665-66 (7th Cir. 2008).

**B.    Disability Standard**

In evaluating a claim for disability benefits, the ALJ follows a five-step, sequential process, asking:

(1)    Has the claimant engaged in substantial gainful activity ("SGA") since his alleged onset of disability?

(2)    If not, does he suffer from a severe, medically determinable impairment?

(3)    If so, does that impairment meet or equal any impairment listed in SSA regulations as presumptively disabling?

(4)    If not, does he retain the residual functional capacity ("RFC") to perform his past work?

(5)    If not, can he perform other jobs existing in significant numbers?

2

E.g., Villano v. Astrue, 556 F.3d 558, 561 (7th Cir. 2009).

"The claimant bears the burden of proof at steps one through four, after which at step five the burden shifts to the Commissioner." Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005). The Commissioner may carry this burden by either relying on the Medical-Vocational Guidelines (a/k/a "the Grid"), a chart that classifies a person as disabled or not disabled based on his age, education, work experience and exertional ability, or by summoning a vocational expert ("VE") to offer an opinion on other jobs the claimant can do despite his limitations. See, e.g., Herron v. Shalala, 19 F.3d 329, 336-37 (7th Cir. 1994). However, because the Grid considers only exertional (i.e., strength) limitations, if the claimant has significant non-exertional limitations (e.g., pain, or mental, sensory or postural limitations) that substantially reduce the range of work he can perform, the ALJ may not rely solely on the Grid and must consult a VE for a more refined assessment. See Luna v. Shalala, 22 F.3d 687, 691 (7th Cir. 1994); Herron, 19 F.3d at 336-37.

## II.  FACTS AND BACKGROUND

### A.  Medical Evidence

#### 1.  Physical Problems

On March 1, 2000, plaintiff presented at the Kenosha Hospital emergency room complaining of abdominal pain of three months duration.  Aside from mild abdominal tenderness, plaintiff's exam was normal, as were lab tests, and he was discharged.  (Tr. at 173.)  On January 24, 2001, plaintiff returned to the ER complaining of pain in his right upper back para-spinal area, worse with bending, twisting or deep breathing.  The doctor diagnosed a muscle strain and provided prescription pain medication.  (Tr. at 168.)  Plaintiff again visited

3

the hospital on August 17, 2001, complaining of lower abdominal pain and trouble urinating. The doctor provided samples of Flomax. (Tr. at 170.)

On January 16, 2003, plaintiff presented at the St. Luke's ER complaining of intermittent left lower quadrant pain for the past three years, worse over the past several months. On exam, the doctor located a small sliding right inguinal hernia, non-tender, probably of no clinical consequence, and a significant bulge with no definite hernia sac palpable in the left inguinal region. (Tr. at 188.) The doctor ordered an abdominal CT scan and referred plaintiff to Dr. Diego Hernandez. (Tr. at 189.)

Plaintiff saw Dr. Hernandez on January 21, 2003. The CT scan had revealed no significant abnormality, but plaintiff continued to complain of discomfort. Dr. Hernandez assessed a left-sided inguinal hernia and, following consultation with a urologist and radiologist, recommended surgery (Tr. at 200-02; 231-33), which he performed on February 3 (Tr. at 225-27). On his February 17 re-check, plaintiff reported doing quite well, aside from a recent slip and fall accident. Dr. Hernandez found no new problems and discharged plaintiff from his care. (Tr. at 199-200.)

However, plaintiff returned to Dr. Hernandez on March 14, 2003, experiencing a problem with neuropraxia[3] involving the ilioinguinal and hypogastric nerves. He complained of trouble raising his lower extremity and flexing his hip. Dr. Hernandez recommended physical therapy and released him from work. The doctor estimated that it might take two to three months for plaintiff's condition to improve. (Tr. at 198.) Dr. Hernandez prepared a report dated March 14, 2003, indicating that plaintiff could sit three hours, and stand and walk two hours in an eight

---

[3]Neuropraxia refers to the "mildest type of nerve lesion that produces clinical deficits." Stedman's Medical Dictionary 1206 (27th ed. 2000).

4

hour day, and had to alternate between sitting and standing every one to two hours. He assessed no limitations on plaintiff's use of the hands, but opined that plaintiff could not repetitively use his left foot. (Tr. at 292.) He further opined that plaintiff could lift up to fifty pounds frequently and up to 100 pounds occasionally. These restrictions were to remain in effect until April 25, 2003. (Tr. at 293.)[4]

On March 20, 2003, plaintiff saw Dr. Bogdan Pudzisz for right upper quadrant pain. The doctor ordered various tests and placed plaintiff on antacids. (Tr. at 197.) The tests were normal, and Dr. Pudzisz provided Prevacid samples. (Tr. at 196; 207.) On March 27, plaintiff saw Dr. Noel Battle, a family practice physician, for high blood pressure. The doctor placed plaintiff on medication and ordered various tests. (Tr. at 194-95.)

Plaintiff returned to Dr. Hernandez on April 7, 2003, continuing to complain of left groin pain and some leg numbness in the inner aspect of his thigh. Plaintiff reported little improvement with physical therapy[5] and did not want to try pain medication. Dr. Hernandez referred plaintiff to a pain specialist and discharged plaintiff from his care. He indicated that about 10% of patients have groin discomfort after hernia repair, and that "this is just a matter of time before it goes away." (Tr. at 193.)

Plaintiff returned to Dr. Battle on April 10, 2003, his blood pressure significantly improved with medication. He reported continued hot flashes, but on further discussion Dr.

---

[4]The record contains two additional reports, dated December 24, 2003 and May 24, 2004, containing similar restrictions. It appears that these reports were completed by a physician's assistant. (Tr. at 288-91.) Although the signatures are hard to read, the reports appear to be signed by Mark Peterson, PAC, who, as discussed below, was involved in plaintiff's care.

[5]Records indicate that plaintiff was discharged from therapy due to non-compliance. (Tr. at 212-22.)

5

Battle concluded that those symptoms may be due to social anxiety. He prescribed Zoloft and continued the blood pressure medication. (Tr. at 192.)[6]

On December 9, 2003, plaintiff saw Dr. Jeffrey Follansbee at the Aurora Pain Clinic regarding his complaints of left groin pain with radiation into the left leg. (Tr. at 676; 775.) The doctor assessed left ilioinguinal nerve entrapment syndrome and suggested left ilioinguinal nerve blocks to see if this would alleviate his pain. He also provided prescriptions for Vicodin and Neurontin to help alleviate neuropathic pain, which he subsequently renewed several times. (Tr. at 677; 680-85; 776-77.)[7]

Plaintiff returned to Dr. Follansbee on January 16, 2004, continuing to complain of left groin pain radiating into the left thigh. Dr. Follansbee again diagnosed left ilioinguinal nerve entrapment syndrome and performed a nerve block, with a good result. Plaintiff was to return in one month for a possible repeat nerve block. (Tr. at 657; 773.) Dr. Follansbee also provided a prescription for Vicodin. (Tr. at 658; 774.)[8]

Plaintiff returned to Dr. Follansbee on March 12, 2004, complaining of left groin pain and pain radiating into the right thigh. Dr. Follansbee suspected two problems, left groin pain secondary to nerve entrapment syndrome, post-hernia repair, and left radicular pain secondary to disc protrusion. He recommended injections and continued medications, including Vicodin

---

[6]On October 12, 2003, plaintiff underwent abdominal and chest x-rays, which were normal. (Tr. at 698-99.)

[7]Abdominal sonogram and hepatobilary nuclear medicine imaging scans completed in December of 2003 were normal. (Tr. at 329-30; 354-55; 448-49; 664; 668.)

[8]On January 29, 2004, plaintiff underwent a lumbar MRI, which revealed a mid-line disc herniation at L4-L5. (Tr. at 316; 327-28; 352-53; 446-47; 650-51.) MRIs of the thoracic and cervical spine completed on March 12, 2004, were normal. (Tr. at 325-26; 350-51; 444-45; 644-45.)

6

and Neurontin. (Tr. at 638; 771.)

On March 14, 2004, plaintiff saw Dr. S. Marshall Cushman at the Neurological Clinic, complaining of left leg and low back pain. He indicated that his left leg pain persisted since the hernia repair, despite physical therapy and treatment at a pain clinic. He reported use of Neurontin, which helped some. Plaintiff also complained of discomfort in the right upper abdomen. (Tr. at 306.) On exam, plaintiff had good range of motion of the back with no localized tenderness to palpation. He had no gross muscle weakness of either lower extremity, but there was a suggestion of slight weakness of dorsiflexion of the left ankle compared to the right. Mental status exam was normal. (Tr. at 305.) He had hypesthesia (i.e, diminished sensitivity)[9] over the medial aspect of the left thigh and down to just above the knee. Dr. Cushman noted that the January 29, 2004, MRI of the lumbar spine demonstrated a central disc herniation at L4-5. However, there was no evidence of radiculopathy on exam, plaintiff's back mobility was normal, and the MRI did not appear to reveal any lateral protrusion that could reasonably account for impingement on nerve roots. Dr. Cushman's impression was ilioinguinal neuropathy, left, post-operative from hernia repair; and lumbar disc herniation, questionably symptomatic. (Tr. at 304.) Dr. Cushman recommended an electro-diagnostic study to clarify the presence or absence of radiculopathy. As to the medial thigh complaint, he suggested consideration of an exploration of the nerve in the pelvic wall. (Tr. at 303.)

On May 3, 2004, plaintiff underwent EMG and nerve conduction studies, which were normal. (Tr. at 313.) Plaintiff returned to Dr. Cushman on May 20, and Dr. Cushman noted the lack of evidence of radiculopathy on the electro-diagnostic study. Dr. Cushman believed

---

[9]See Stedman's Medical Dictionary 857 (27th ed. 2000).

7

that the L4-5 disc herniation was not the cause of plaintiff's trouble. He referred plaintiff to Dr. Grant Shumaker for possible surgical exploration of the affected nerves. (Tr. at 300.)

On June 23, 2004, plaintiff saw Dr. Shumaker, who indicated that plaintiff's left thigh pain did not represent a lateral femoral cutaneous nerve entrapment syndrome but could be related to the lumbar disc herniation. He ordered a CT scan, referred plaintiff for a lumbar epidural injection, and prescribed Vicodin. If the epidural failed, Dr. Shumaker would proceed with lumbar discography of L4-5 and L5-S1. (Tr. at 298-300.) The abdominal CT scan, completed on July 2, 2004, was normal. (Tr. at 323; 348; 442; 619.)[10]

Plaintiff returned to Dr. Follansbee on June 30, 2004, regarding his left-sided groin pain and low back pain. The doctor suggested left ilioinguinal nerve blocks, but plaintiff demurred, and Dr. Follansbee continued to manage his condition medically with Vicodin and Neurontin. (Tr. at 625; 769.)[11] However, after his pain worsened, plaintiff agreed to an epidural injection on August 10. (Tr. at 601-02; 767-68.) He underwent a repeat lumbar epidural injection on September 9, with a third injection planned in one month. If this treatment failed to produce a response, Dr. Follansbee suggested proceeding with a provocative lumbar discography and consultation with Dr. Shumaker for possible surgery. (Tr. at 591; 762.) In meantime, he continued plaintiff on pain medications. (Tr. at 592; 763.) On October 12, plaintiff reported that he experienced some relief with the injections, but the pain later returned. Dr. Follansbee performed another epidural injection, again noting that if plaintiff failed to respond they would

---

[10]Additional medical notes indicate that plaintiff saw Dr. Joseph Paukner and Mark Peterson, PAC, for back pain and medications during this time. (Tr. at 336-44.)

[11]On July 9, 2004, plaintiff underwent a left hand x-ray, which revealed a minimally displaced fracture of the proximal half of the first metacarpal, after he apparently fell down some stairs. (Tr. at 322; 347; 441; 613; 615.)

8

seek insurance approval for a provocative discography procedure, then send plaintiff back to Dr. Shumaker for possible surgical intervention.  (Tr. at 582-83; 760-61.)  Plaintiff returned to Dr. Follansbee on November 30, continuing to complain of low back pain with no significant response to the cortisone injections.  The doctor suggested a surgical referral, with provocative discography first.  (Tr. at 575; 757.)[12]

On February 28, 2005, plaintiff underwent a lumbar MRI, which revealed bi-level disc space narrowing and dessication at L4-L5 and L5-S1, central disc protrusion at L4-L5, and a mild concentric disc bulge at L5-S1.  (Tr. at 436; 469; 566; 755.)  Plaintiff returned to Dr. Follansbee on June 16, 2005, and the doctor noted that plaintiff had seen a surgeon, who did not recommend surgery at the time due to plaintiff's young age.  On exam, plaintiff exhibited tenderness at L4-L5 and to a lesser degree at L5-S1.  Dr. Follansbee scheduled a series of three lumbar epidural steroid injections over the next two to three months.  (Tr. at 467-68; 752-53.)[13]

Dr. Follansbee performed the first injection on September 13, 2005 (Tr. at 464-65; 749-50), which provided an approximate 30% decrease in pain lasting about two weeks.  Plaintiff was able to increase his activity and do more around the house, but the pain then returned, though to a lesser degree.  (Tr. at 462; 737.)

---

[12]On January 5, 2005, plaintiff saw Dr. Rajeev Nayar of GI Associates regarding his persistent right upper quadrant pain.  (Tr. at 475.)  Dr. Nayar performed an upper endoscopy on February 11, which revealed esophagitis at the GE junction and diffuse gastritis.  He started plaintiff on Prilosec and ordered further testing.  (Tr. at 485.)  A hepatobiliary scan completed on February 28 revealed normal gallbladder ejection fraction.  (Tr. at 471; 571.)

[13]Plaintiff also underwent physical therapy in August and September 2005, but he attended irregularly and did not meet his goals.  (Tr. at 541-45; 560; 739-48.)  Plaintiff underwent further therapy in early 2006.  (Tr. at 450-52.)

9

Plaintiff returned to Dr. Follansbee, scheduled for another injection on December 6, 2005, but declined to proceed because he obtained limited relief from the previous injection. Dr. Follansbee noted that plaintiff was unwilling to engage in further physical therapy or receive further injections, and that compliance was "partly at issue here." (Tr. at 460; 734.) He recommended that plaintiff consider surgical intervention and obtain a neuro-surgical evaluation. (Tr. at 460-61; 734-35.)

On May 16, 2006, plaintiff saw Laura Mays, PA-C, regarding his progressively worsening low back pain. He reported constant low back pain with radiation bilaterally to the posterior buttock/thigh region and intermittent radiation to the proximal aspect of the bilateral calves. He also reported give-way weakness of bilateral lower extremities. Plaintiff had been evaluated by Dr. Shumaker in 2004, at which time he was referred for provocative lumbar discography as a pre-operative study prior to a likely lumbar fusion. Plaintiff reported inability to follow through on these procedures as Dr. Shumaker did not accept his insurance plan. Plaintiff reported receiving multiple epidural injections from Dr. Follansbee, as well as several courses of physical therapy, with no lasting relief. Plaintiff also reported inability to return to work as a tree trimmer due to his symptoms, which significantly interfered with his quality of life. On exam, he displayed significantly reduced range of motion of the lumbar spine. (Tr. at 395; 731.) PA Mays noted that MRI scans completed in February 2004 and March 2005 revealed degenerative disc disease at the L4-5 and L5-S1 levels, and referred plaintiff for a repeat lumbar MRI, after which he was to follow-up in her office. Based on the failure of conservative treatment, she indicated that he would likely benefit from lumbar fusion. (Tr. at 396; 732.) A May 19, 2006 MRI of lumbar spine revealed multi-level disc space narrowing and dessication at L1-L2, L4-L5 and L5-S1, and central disc protrusion at L4-L5 that compressed the ventral

10

thecal sac. (Tr. at 728-30.)

Plaintiff saw Dr. Thomas Perlewitz, an orthopedic surgeon, in follow-up on June 1, 2006. (Tr. at 397; 458; 795.) Plaintiff reported a scheduled discography study through the Kenosha Pain Clinic, and Dr. Perlewitz indicated that they would await the results to determine whether surgery would be a good option. (Tr. at 397; 725; 795.) Dr. Follansbee concurred in the recommendation of a provocative lumbar discogram, with possible surgical intervention to follow. (Tr. at 456-57; 726-27.) However, the discography had to be postponed after plaintiff accidentally shot himself in the left thigh and subsequently developed blood clots, requiring treatment with anti-coagulants. Dr. Follansbee increased plaintiff's Hydrocodone dosage based on tolerance to the medication. (Tr. at 393; 454; 722; see also 417-21.) On August 24, plaintiff advised Dr. Follansbee that his back pain was well controlled with medication and that he recently secured a new job. (Tr. at 719.) Plaintiff returned to Dr. Follansbee on October 24, reporting that he could not keep upon on his new job trimming trees due to back pain. Dr. Follansbee strongly recommended that he follow up with a neurosurgeon as soon as he stopped taking Coumadin. (Tr. at 716.)

On November 9, 2006, plaintiff saw Dr. Eric Pifel after falling while trimming a tree, resulting in a left heel fracture. Dr. Pifel placed him in a short leg splint, scheduled a CT scan to check for displacement or possible other injury to the foot, and prescribed Percocet. (Tr. at 715.) The CT scan, completed on November 13, revealed a calcaneal fracture with minimal displacement and no other fractures. (Tr. at 714.) Plaintiff returned to Dr. Pifel on December 7 and was placed in a boot brace, with follow up in one month, and provided Vicodin. (Tr. at 712.)

11

## 2.    Mental Problems

On September 4, 2002, plaintiff presented at the Aurora Medical Center ER after threatening to hurt himself with a knife.  However, he admitted that he did so to gain attention and had no actual intent to harm himself; he did complain of "hot flashes."  He was released the same day.  (Tr. at 176-84.)

On August 19, 2004, plaintiff saw Dr. Ronald Rubin, a psychiatrist, who diagnosed panic disorder, social phobia and post-traumatic stress disorder ("PTSD"), with a current GAF of 60,[14] and prescribed Xanax and another medication.  (Tr. at 766.)  On August 26, plaintiff reported doing better with the medications, and Dr. Rubin raised his GAF to 70.  (Tr. at 765.)  On September 18, Dr. Rubin assessed a current GAF of 62, highest in past year – 70.  (Tr. at 764.) On October 20, plaintiff reported that he was "functioning great," and Dr. Rubin assessed a GAF of 75.  (Tr. at 759.)

Plaintiff returned to Dr. Rubin on January 24, 2005, and reported doing well on Xanax, which the doctor continued, recording a GAF of 75.  (Tr. at 756.)  Dr. Rubin again noted a GAF of 75 on March 10. (Tr. at 754.)  On July 1, Dr. Rubin noted that plaintiff was "doing pretty good," with a GAF of 75, and continued plaintiff on Xanax.  (Tr. at 751.)  On October 28, Dr. Rubin recorded a GAF of 70 and noted that plaintiff was doing well.  He continued plaintiff on Xanax.  (Tr. at 736.)  On January 13, 2006, Dr. Rubin again recorded a GAF of 70 and continued Xanax.  (Tr. at 733.)  On July 7, Dr. Rubin added Adderall to the Xanax, and

---

[14]GAF stands for Global Assessment of Functioning.  Set up on a 0-100 scale, scores of 91-100 are indicative of a person with no symptoms, while a score of 1-10 reflects a person who presents a persistent danger of hurting himself or others. Scores of 71-80 reflect "transient" symptoms, 61-70 "mild" symptoms, 51-60 "moderate" symptoms, and  41-50 "severe" symptoms. Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32-34 (4th ed. 2000).

12

assessed a GAF of 68.  (Tr. at 724.)  On August 24, Dr. Rubin noted that plaintiff was doing better with the Adderall, and again recorded a GAF of 68.  (Tr. at 721.)  On September 29, Dr. Rubin noted a current GAF of 68, and highest GAF in past year of 75.  (Tr. at 718.)

On December 20, 2006, Steven Goldberg, LCSW, completed a questionnaire.  Goldberg indicated that he first saw plaintiff on November 28, 2006, and listed diagnoses of panic disorder, PTSD and ADHD, with a GAF of 68.  He assessed moderate limitation of activities of daily living and moderate difficulty in maintaining social functioning, with deficiencies in concentration, persistence and pace "present."  (Tr. at 704.)  Goldberg further opined that plaintiff was markedly impaired in the ability to understand, remember and carry out detailed instructions, work in coordination with others without being distracted, complete a normal work day without interruption from psychological symptoms, and ask simple questions or request assistance; and moderately impaired in the ability to remember locations and work procedures, maintain attendance and punctuality, accept instructions and respond appropriately to supervision, and travel in unfamiliar places.  He was impaired in the ability to maintain attention and concentration for extended periods.  (Tr. at 705-06.)

### 3.    SA Consultants

On July 9, 2003, Gregory Rudolph, Ph.D., performed a mental status evaluation of plaintiff for the SSA.  Dr. Rudolph assessed dysthymia, generalized anxiety disorder, and post-traumatic stress disorder based on physical abuse as a child, with a GAF of 55.  (Tr. at 234-35.)  Plaintiff reported no history of psychiatric treatment but had been placed on Zoloft by his physician.  He also reported anxiety around people and in enclosed spaces, along with a history of physical abuse by his mother's ex-husband between the ages of five and eight.  He indicated an ability to care for himself, drive and help with house-hold chores.  (Tr. at 236.)  His

13

memory, fund of information, reasoning and judgment were adequate. (Tr. at 237.) Following Dr. Rudolph's evaluation, two state agency consultants completed psychiatric review technique forms (PRTFs), finding that plaintiff had no severe mental impairment. (Tr. 238-65.) Specifically, they found, under the "B criteria," no restriction of activities of daily living, mild restriction of social functioning, no difficulty maintaining concentration, persistence or pace, and no episodes of decompensation. (Tr. at 248; 262.)

On May 4, 2004, a state agency consultant completed a physical RFC report, finding plaintiff capable of medium work. (Tr. at 356-364.) Another consultant reviewed and affirmed the report on August 11, 2004. (Tr. at 364.)

On August 13, 2004, Dr. Rattan completed a PRTF assessing plaintiff's current condition, finding no severe mental impairment. (Tr. at 365.) Under the B criteria, he found mild restriction of activities of daily living, with no degree of limitation in the other categories. (Tr. at 375.) Dr. Rattan completed another report dated August 28, 2004, assessing plaintiff's condition through December 31, 2002 (plaintiff's date last insured), in which he found no medically determinable impairment. (Tr. at 379.)

## B.    Hearing Testimony

On August 3, 2006, plaintiff appeared pro se before ALJ Gregory Pokrass, who adjourned the hearing to allow plaintiff time to retain counsel. (Tr. at 820-47.) Plaintiff returned, with counsel, on December 21, 2006. (Tr. at 849.) Plaintiff testified that he was then age twenty-six, with an eleventh grade education and past work as a forklift driver, mixer machine operator, and tree trimmer. (Tr. at 853-56.)

Plaintiff testified that he suffered from anxiety and panic attacks, for which he took Alprazolam, which helped "to a certain extent." (Tr. at 865-66.) He indicated that he rarely

14

went out socially and frequently felt depressed. (Tr. at 866.) He stated that he mostly laid on the couch and took his medication. (Tr. at 869.) He indicated that he did not drive due to the number of pills he took. (Tr. at 870.)

Plaintiff testified that he felt pain from the middle of his back to his buttocks, that his legs felt numb most of the time, and that he fell down daily. (Tr. at 870-71.) He stated that he laid down most of the day, aside from getting up to use the bathroom. He was able to dress himself, but his wife tied his shoes. (Tr. at 871-72.) He indicated that he could stand for about twenty-five minutes and sit for less than ten minutes before experiencing pain. (Tr. at 872-74.) He indicated that laying down was the only comfortable position, and he did so for three to four hour stretches, in front of the TV. He did little around the house; his wife did the cooking, cleaning and laundry. (Tr. at 874-75.) He indicated that he could walk less than a block. (Tr, at 877-78.) Plaintiff further testified to stomach pain, particularly when sitting. (Tr. at 881-82.) He stated that doctors found bacteria in his stomach, for which he was provided antibiotics. (Tr. at 883-86.) He indicated that he had been through physical therapy six or seven times without success. (Tr. at 890.) Finally, he indicated that he could not bend the tips of several fingers following an accident with a chainsaw at work. (Tr. at 891-92.) On questioning from the ALJ, plaintiff indicated that he had not undergone back surgery because he was on blood thinners after accidentally shooting himself, issues with his insurance, and his doctors' reluctance to operate on someone of his young age. (Tr. at 894-95.)

## C.    ALJ's Decision

On February 16, 2007, the ALJ issued an unfavorable decision. (Tr. at 23.) The ALJ assumed, despite indications in the medical records that plaintiff had returned to tree trimming work, that plaintiff had not engaged in SGA since the alleged onset date of October 1, 2002.

15

(Tr. at 28.) The ALJ determined that plaintiff's lumbar disorder was a severe impairment, but that his other alleged impairments (heel fracture, hernia, hypertension, mental problems, abdominal pain) were non-severe. (Tr. at 28-29.) The ALJ concluded that the lumbar disorder did not meet a Listing (Tr. a 29), and that plaintiff retained the RFC for unskilled, sedentary work (Tr. at 30). The ALJ rejected plaintiff's testimony of greater limitations, finding that nothing in the record suggested that plaintiff could not function in sedentary employment. (Tr. at 31.) The ALJ determined that, based on a sedentary RFC, plaintiff could not return to his past work as a forklift driver, mixing machine operator or tree trimmer, all performed at the heavy level. However, at step five the ALJ determined, based on plaintiff's young age, education, work experience and RFC for a full range of sedentary work, that Grid Rule 201.24 directed a finding of not disabled. (Tr. at 32.)

**D.  Appeals Council Proceeding**

Plaintiff requested review by the Appeals Council, submitting additional medical records created after the ALJ's decision. On May 31, 2007, plaintiff saw Dr. Follansbee, who noted that according to a May 15 discogram plaintiff had herniated discs at the L4-L5 and L5-S1 levels, with L4-L5 most symptomatic. (Tr. at 806-07; 811-15; 818.) On June 21, 2007, plaintiff underwent a neuro-surgical consult with Dr. Pannu, who recommended lumbar fusion. (Tr. at 803-05.) On June 28, 2007, Dr. Follansbee noted that plaintiff was to undergo a two level lumbar fusion with Dr. Pannu, but that no date for the surgery had been scheduled. (Tr. at 798.) Finally, according to a July 5, 2007, pre-surgical information sheet, plaintiff was scheduled for surgery on August 1, 2007.[15] (Tr. at 794.) As noted above, the Council denied

---

[15]No records pertaining to the actual surgery were submitted to the Council; nor has plaintiff submitted such records to the court.

16

review.

### III. DISCUSSION

Plaintiff argues that the ALJ erred in evaluating the credibility of the testimony, assessing the severity of his multiple physical conditions and his mental limitations, and in relying on the Grid at step five. He also argues that the Appeals Council erred in failing to remand after receipt of new and material evidence. I address each argument in turn.

### A.    Credibility

Plaintiff first argues that the ALJ misconstrued the record in evaluating the credibility of his testimony. In evaluating the credibility of a claimant's allegations of pain or other disabling symptoms, the ALJ must follow a two-step process. See SSR 96-7p. First, he must determine whether the claimant suffers from some medically determinable impairment that could reasonably be expected to produce the symptoms. If not, the alleged symptoms cannot be found to affect his ability to work. Second, if the ALJ finds that the claimant has an impairment that could produce the symptoms alleged, the ALJ must determine the extent to which the symptoms limit his ability to work. SSR 96-7p. In making this determination, the ALJ considers the entire record, including the claimant's daily activities; the location, duration, frequency and intensity of the claimant's pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any medication the claimant takes to alleviate pain or other symptoms; treatment, other than medication, for relief of pain or other symptoms; any measures the claimant uses to relieve pain or other symptoms; and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3); SSR 96-7p. The ALJ must provide specific reasons for a credibility

17

determination, grounded in the evidence and articulated in the decision.  See Lopez v. Barnhart, 336 F.3d 535, 539-40 (7th Cir. 2003).  So long as the ALJ substantially complies with these requirements, the court reviews the ALJ's credibility determination deferentially, reversing only if it is patently wrong.  E.g., Simila, 573 F.3d at 517.

In the present case, the ALJ accepted that defendant's back condition, confirmed by various examinations and MRIs and treated with medications, injections and physical therapy, constituted a severe impairment.  The ALJ further found that this impairment limited plaintiff to sedentary work and could reasonably produce the symptoms alleged.  However, the ALJ found that plaintiff's statements about the intensity and limiting effects of those symptoms were not entirely credible.  Despite plaintiff's testimony that he could not work in any capacity and was essentially bed-ridden, the ALJ cited medical notes indicating that in August 2006 plaintiff returned to tree trimming.  The ALJ further cited medical evidence documenting increased household activities and plaintiff's history of non-compliance with prescribed treatment.   (Tr. at 31.)

Plaintiff attacks the ALJ's reasons, but substantial evidence supports them, and the ALJ's resulting conclusion cannot be deemed patently wrong.  At least three medical notes support the ALJ's finding that plaintiff returned to tree trimming.  On August 24, 2006, plaintiff told Dr. Follansbee that he "recently secured a new job and was very excited about his new position." (Tr. at 719.)[16]  On October 24, 2006, plaintiff told Dr. Follansbee that he "had recently started a new job where he was working in the lumber or tree trimming industry."  (Tr. at 716.)

---

[16]At the first hearing on August 6, 2006, plaintiff stated that he was not working, that no one would hire him, and that he was a tree trimmer by trade.  (Tr. at 830.)  According to the medical record cited in the text, he obtained a job trimming trees just a few weeks later.

18

And on November 9, 2006, Dr. Pifel noted that plaintiff "was trimming a tree approximately three days prior, had a fall, and had immediate pain in his left foot." (Tr. at 715.) Plaintiff alleges that the record pertaining to his foot injury is "plainly false," but he fails to explain why this is so.[17] He also faults the ALJ for not providing him a chance to explain the alleged factual error, but plaintiff was represented by counsel at the hearing, and the record contains no suggestion that the ALJ in any way limited the testimony or failed to fully and fairly develop the record.

Noting a statement in the October 24, 2006 record that plaintiff "could not keep up" with his tree trimming duties due to back pain (Tr. at 716), plaintiff next argues that the ALJ should have treated this as an "unsuccessful work attempt," see SSR 05-2. But since plaintiff denied working altogether (and thus made no attempt to explain away his return to tree trimming at the hearing), it is unclear why the ALJ should have done so. See Penick v. Astrue, No. 3:08CV549, 2009 WL 3055446, at *13 (E.D. Va. Sept. 23, 2009) ("As it is Plaintiff's burden to demonstrate that any past employment qualified as an unsuccessful work attempt, and no evidence was produced by Plaintiff at the hearing, the argument is without merit."). Further, even if this evidence tended to show that plaintiff could not return to work as a tree trimmer, the ALJ did not find that he could. Rather, he limited plaintiff to sedentary work and denied the claim at step five. Plaintiff fails to explain why the ALJ could not reasonably conclude that his return to such strenuous activity, even for a limited period of time, undercut his claim of total disability. See Martz v. Astrue, No. 1:07-CV-00219, 2008 WL 975051, at *5 (N.D. Ind. Apr. 8, 2008) (finding that the ALJ properly considered the claimant's level of work activity in assessing

---

[17]Plaintiff directs me to his letter brief to the Appeals Council, but that document also fails to explain why the medical note is wrong.

credibility); <u>Jesse v. Barnhart</u>, 323 F. Supp. 2d 1100, 1106 (D. Kan. 2004) ("Although plaintiff correctly argues that her desire to work should not be used as a negative credibility factor, here plaintiff actually worked; when work is not substantial gainful employment, the ALJ can consider this a factor in his determination of credibility.") (footnote omitted).

Regarding plaintiff's household activities, an October 4, 2005 note by Dr. Follansbee indicated that plaintiff "had increased his activity and was doing more work around the house; however, over the last several weeks he has noted a . . . return of his back pain, though to a lesser degree." (Tr. at 462.) Plaintiff faults the ALJ for not mentioning the qualification in the note, but the ALJ could reasonably conclude that this evidence undercut plaintiff's testimony that he did nothing around the house. Nor did the ALJ, in noting this as one of several reasons for his credibility finding, place "undue weight" on plaintiff's household activities. <u>See</u> <u>Mendez v. Barnhart</u>, 439 F.3d 360, 362 (7th Cir. 2006). Plaintiff notes that he continued to seek treatment for his back after the alleged improvement, but the ALJ did not find otherwise, and, as noted, he limited plaintiff to sedentary work.

Finally, regarding plaintiff's compliance with treatment, the ALJ cited a December 6, 2005 note from Dr. Follansbee, indicating that plaintiff did not want surgery, and was unwilling to undergo more physical therapy or have further cortisone injections. (Tr. at 460.) Dr. Follansbee concluded: "Compliance does seem to be partly at issue here." (Tr. at 460.) Plaintiff points to other evidence showing that he continued in treatment, culminating with the July 2007 decision to proceed with surgery, and to his testimony that he delayed surgery based on insurance and other issues, including his use of blood thinners. But it is the ALJ's job, not the court's, to weigh the evidence, resolve evidentiary conflicts, and decide questions of credibility. <u>Powers v. Apfel</u>, 207 F.3d 431, 434 (7th Cir. 2000). The court must affirm the ALJ's

20

decision if his findings and inferences reasonably drawn from the record are supported by substantial evidence, even though some evidence may also support the claimant's position. Sample v. Shalala, 999 F.2d 1138, 1143 (7th Cir. 1993). Plaintiff essentially asks me to re-weigh the evidence and draw a different conclusion regarding his compliance and declination of surgery, but that would exceed the permissible scope of judicial review. Nor may I find reversible error based on evidence, such as the June-July 2007 records, which post-date the ALJ's decision. See Rice v. Barnhart, 384 F.3d 363, 366 n.2 (7th Cir. 2004).[18]

**B.  Physical Conditions**

Plaintiff next argues that the ALJ erred in assessing the impact of his multiple physical conditions. Specifically, he faults the ALJ for finding that he has no lasting functional limitation relating to his hernia repair (Tr. at 29), and that he is capable of a full range of sedentary work (Tr. at 30). He points to medical evidence suggesting limitations on his ability to sit (Tr. at 288, 290, 292) and perform overhead lifting and postural movements (Tr. at 451-52), and to his own testimony that he cannot bend his fingers (Tr. at 892), arguing that these limitations erode his ability to perform a full range of sedentary work. See SSR 83-10 (explaining that sedentary work involves lifting no more than 10 pounds at a time, is performed primarily in a seated position, and requires good use of the hands and fingers for repetitive hand-finger actions); see also SSR 96-9p ("Sitting would generally total about 6 hours of an 8-hour workday.").

Regarding his alleged sitting limitations, plaintiff cites Dr. Hernandez's March 14, 2003, report, in which the doctor indicated that plaintiff could sit three hours, stand two hours and

---

[18]I do consider these records on plaintiff's argument of Appeals Council error.

21

walk two hours, and had to alternate between sitting and standing every one to two hours.[19] (Tr. at 292.)  However, Dr. Hernandez also stated in this report that plaintiff had not reached maximum improvement and that these restrictions would remain in effect until plaintiff was re-evaluated the following month.  (Tr. at 293.)  As the ALJ noted, Dr. Hernandez discharged plaintiff from his care on April 7, 2003, stating that about 10% of hernia patients have groin discomfort and "this is just a matter of time before it goes away."  (Tr. at 193.)  Dr. Hernandez referred plaintiff to a pain specialist, but he imposed no permanent restrictions.  The record contains two additional reports, dated December 24, 2003 (Tr. at 290-91) and May 26, 2004 (Tr. at 288-89) containing similar restrictions, which the parties attribute to Dr. Hernandez. However, these reports appear to be signed by a physician's assistant, not by Dr. Hernandez. See 20 C.F.R. § 404.1513(d) (indicating that physician's assistants are not "acceptable medical sources").  In any event, the ALJ specifically considered and rejected plaintiff's claim that he could not sit or stand for a "long period without altering his position" (Tr. at 31), finding that he could nevertheless perform a full range of sedentary work (Tr. at 31).  Finally, the state agency consultants, whose reports the ALJ also considered (Tr. at 31), opined that plaintiff could perform medium work, with no sitting restriction (Tr. at 356-64).

Regarding his overhead lifting ability, plaintiff relies on a single physical therapy note, in which the therapist records one of plaintiff's "deficits" as "lifting overhead."  (Tr. at 452.) However, the therapist did not test plaintiff's shoulder, elbow or wrist function (Tr. at 451), and the note does not indicate the degree of any deficit in overhead strength, which could support an inference that plaintiff cannot meet the minimal lifting requirements of sedentary work.  Nor

_____

[19]Somewhat contradictorily, the doctor went on to find that plaintiff could meet the lifting requirements of heavy work but also had significant postural limitations.  (Tr. at 293.)

22

does the record appear to contain any objective medical support for such a restriction. Nor does plaintiff ever explain the origin or cause of any upper arm complications. Thus, I cannot find the ALJ's failure to specifically address this note harmful error. Plaintiff relies on the same note in support of his claim of deficits in balance, bending, kneeling and stooping (Tr. at 452), but the note again fails to explain the degree of limitation in these areas. Nor does plaintiff explain how any limitation in performing such postural activities would prevent him from performing sedentary work. See SSR 83-10 ("By its very nature, work performed primarily in a seated position entails no significant stooping.").

Plaintiff claims that his inability to bend his fingers erodes the sedentary job base, but the only evidence he cites for such limitations is his own testimony. He cites no medical evidence supporting any restriction on his ability to use his hands, and as noted earlier, the ALJ found plaintiff's testimony less than fully credible.

Plaintiff also argues that the ALJ failed to address the pain and numbness associated with his left ilioinguinal nerve entrapment (as distinct from his lumbar spine problem). However, as plaintiff concedes, he received concurrent treatment for pain related to both conditions, and the ALJ fully addressed plaintiff's claims of disabling pain and weakness. As discussed above, the ALJ found that plaintiff's severe impairment could produce the symptoms alleged, but that plaintiff's testimony as to the severity of his symptoms was not entirely credible. Plaintiff fails to explain how the result could have been different had the ALJ attributed that pain to two overlapping conditions rather than one.

Finally, plaintiff argues that the ALJ failed to assess the side effects of his narcotic pain medications, but he cites no evidence that he experiences such side effects. Therefore, this was at most harmless error. See Sanchez v. Barnhart, 467 F.3d 1081, 1082-83 (7th Cir. 2006)

23

("[I]n administrative as in judicial proceedings, errors if harmless do not require (or indeed permit) the reviewing court to upset the agency's decision."); <u>Keys v. Barnhart</u>, 347 F.3d 990, 994 (7th Cir. 2003) (holding that "the doctrine of harmless error . . . is fully applicable to judicial review of administrative decisions").[20]

## C.    Mental Limitations

Plaintiff next argues that the RFC failed to account for his mental impairments and associated non-exertional limitations. Where, as here, a claimant alleges disability due to a mental impairment, the ALJ applies a "special technique" in evaluating the claim. 20 C.F.R. 404.1520a(a). Under this technique, the ALJ first considers whether, under the "A criteria" of the Listings, which substantiate medically the presence of a particular mental disorder, the claimant has a medically determinable mental impairment. § 404.1520a(b)(1). If so, the ALJ must under the "B criteria" rate the degree of functional limitation resulting from the impairment. § 404.1520a(b)(2). The B criteria have four components: activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. § 404.1520a(c)(3). The ALJ rates the degree of limitation in the first three areas using a five-point scale: none, mild, moderate, marked and extreme, and the degree of limitation in the fourth (episodes of decompensation) using a four-point scale: none, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity. § 404.1520a(c)(4). On the other hand, if the ALJ rates the

---

[20]In a footnote, plaintiff argues that the ALJ erred in making a conclusory finding that he did not meet a Listing. However, plaintiff makes no effort to show that he does meet any particular Listing. Thus, any error in the ALJ's explanation of his decision on this issue is also harmless. <u>See, e.g.</u>, <u>Ramos v. Astrue</u>, No. 09-C-0392, 2009 WL 4555567, at *14 (E.D. Wis. Nov. 27, 2009).

24

degree of limitation as "none" or "mild," he may generally find that the claimant has no severe mental impairment.  § 404.1520a(d)(1).

The ALJ followed that process here, noting that plaintiff had received some treatment and medication for panic disorder, mood disorder, PTSD and ADD, but that his GAF scores were generally indicative of mild symptoms.  The ALJ considered social worker Goldberg's questionnaire, which suggested moderate limitations, but found these restrictions inconsistent both with the GAF score of 68 referenced within the report and with the record as a whole.  The ALJ further cited medical records in which defendant denied the need for mental health treatment.  The ALJ accordingly rated plaintiff's limitations under the B criteria as none or mild, thus finding no severe mental impairment (Tr. at 29), consistent with the state agency consultants who completed PRTFs.

Plaintiff first argues that, under SSR 96-8p, the ALJ can find a claimant to lack functional limitations only where "'there is no allegation of a physical or mental limitation.'" (Pl.'s Br. at 18). The Ruling actually says: "When there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity."  There is no regulation or Ruling requiring an ALJ to find functional limitations whenever the claimant makes an allegation.

Plaintiff next argues that the ALJ improperly rejected the report of his treating physician on his mental limitations.  However, the report at issue was prepared by a social worker (Goldberg), who cannot qualify as a treating source.  See 20 C.F.R. 404.1502 & 404.1513. Thus, the ALJ was under no obligation to defer to this report, give it great weight or seek clarification from its author.  The ALJ nevertheless considered the report, finding it internally

25

inconsistent and inconsistent with the record as a whole. See Lacroix v. Barnhart, 465 F.3d 881, 886-87 (8th Cir. 2006) (affirming ALJ's rejection of other source reports based on lack of support by objective psychological tests, inherent inconsistency, and inconsistency with other evidence in the record). Specifically, the ALJ noted the records from plaintiff's treating psychiatrist documenting GAF scores of 68-75. Plaintiff faults the ALJ for relying on GAF scores, but he cites no authority making such consideration inappropriate. While a GAF score may represent a "snapshot" of the claimant's condition, the scores cited in this case reflected a person with minimal mental limitations. Plaintiff argues that the ALJ failed to explain his "departure" from Dr. Rudolph's report, which contained a GAF of 55, but Dr. Rudolph's report contains no functional limitations inconsistent with the ALJ's RFC for unskilled work. Plaintiff also fails to explain how the ALJ's RFC for unskilled work conflicts with social worker Goldberg's notation of severe limitations in carrying out detailed instructions and concentrating for extended periods of time. In any event, the ALJ rejected this report, for reasons supported by the record.

Plaintiff contends that the ALJ should have ordered a consultative examination, but the ALJ already had a such a report before him (from Dr. Rudolph), as well as several PRTFs. The court must generally respect the ALJ's reasoned judgment on how much evidence to collect. See Luna, 22 F.3d at 692 (citing Kendrick v. Shalala, 998 F.2d 455, 458 (7th Cir. 1993)). Plaintiff also argues that the ALJ should not have considered his declination of treatment, as those who suffer from mental illness often fail or refuse to get help, but I cannot find error in the ALJ noting this as just one of several reasons for his decision. Plaintiff faults the ALJ for not citing the record of a phone conversation he had with an SSA employee, in which he mentioned his mental problems, but the ALJ is not required to discuss every piece of evidence

26

in the record.  E.g., Simila, 573 F.3d at 516.  Finally, plaintiff contends that the ALJ substituted

his own lay opinion for that of a physician, but the ALJ had before him the reports of several

consultants finding no severe mental impairment, as well as the records from plaintiff's treating

psychiatrist documenting minimal symptoms; plaintiff cites no report from an acceptable

medical source supporting greater restrictions.

**D.    Step Five**

Plaintiff next argues that the ALJ erred in relying on the Grid at step five, rather than

summoning a VE.  However, because the ALJ found that plaintiff could perform a full range of

sedentary, unskilled work, he was permitted to rely on the Grid.  Plaintiff argues that the ALJ

failed to account for significant non-exertional limitations, which made reliance on the Grid

improper.  However, as discussed above, the ALJ reasonably rejected plaintiff's claims of

severe pain and numbness, postural and manipulative limitations, medication side effects, and

inability to concentrate.  Having rejected such limitations, there was no impediment to use of

the Grid at step five.  See, e.g., Luna, 22 F.3d at 692 (affirming an ALJ's use of the Grid where

substantial evidence supported the finding that the claimant's claimed non-exertional limitations

had no significant impact on his ability to perform the full range of sedentary work); Nelson v.

Secretary of Health & Human Services, 770 F.2d 682, 685 (7th Cir. 1985) (noting that the

presence of a non-exertional limitation precludes use of the Grid only if it is severe enough to

restrict a full range of gainful employment at the designated level, and affirming the ALJ's

conclusion that the claimant "could perform a variety of work related functions despite the fact

that she might experience some discomfort in the process").

27

### E. New Evidence

Finally, plaintiff argues that the Appeals Council erred in not remanding the case for consideration of the new medical records indicating that he had scheduled surgery. Noting that the ALJ appeared to be influenced by the fact that he had not undergone surgery, plaintiff argues that this evidence may have changed the ALJ's view of the case. He also suggests that remand for consideration of new evidence under sentence six of § 405(g) would be appropriate.[21]

The Appeals Council will review a case if the claimant submits "new and material evidence" that, in addition to the evidence already considered by the ALJ, makes the ALJ's decision "contrary to the weight of the evidence" in the record. Getch v. Astrue, 539 F.3d 473, 483 (7th Cir. 2008) (quoting 20 C.F.R. § 404.970(b)). Medical evidence postdating the ALJ's decision, unless it speaks to the claimant's condition at or before the time of the administrative hearing, could not have affected the ALJ's decision and therefore does not meet the materiality requirement. Id. at 484; see 20 C.F.R. 404.970(b) ("If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision."). The court considers de novo whether the Council made an error of law in applying this regulation. Absent such a legal error, the Council's decision whether to review is discretionary and unreviewable. Getch, 539 F.3d at 483-84 (citing Perkins v. Chater, 107 F.3d 1290, 1294 (7th Cir. 1997)).

To merit a sentence six remand, the claimant must show that there is new evidence

---

[21]In a footnote, plaintiff suggests a remand to locate the Appeals Council's decision. However, he fails to develop any argument as to why that would be appropriate. Resolution of this issue depends on the nature of the new evidence plaintiff submitted to the Council, which is in the record.

28

which is material, and that there is good cause for failure to incorporate such evidence into the record in the prior proceeding. Evidence is "new" if it was not in existence or available to the claimant at the time of the administrative proceeding. Evidence is "material" if there is a reasonable probability that the Commissioner would have reached a different conclusion had the evidence been considered. Jens v. Barnhart, 347 F.3d 209, 214 (7th Cir. 2003).

Although the issue of whether the Council committed legal error in declining review and whether I should grant a sentence six remand are technically separate, they both essentially come down to whether the new evidence is material. I cannot conclude that it is.

While the ALJ did comment on the lack of surgery, the new records do not indicate that plaintiff, in fact, underwent surgery. Rather, they indicate that he underwent a discogram and had located a neuro-surgeon, Dr. Pannu, who recommended and agreed to perform a lumbar fusion, and that the surgery had been scheduled for August 2007. The records before the ALJ contained similar findings and recommendations.[22] Plaintiff fails to otherwise explain how these records relate to his condition during the relevant time period, and nothing in the records suggests greater limitations than those found by the ALJ. To the extent that these records might suggest a worsening condition, plaintiff's remedy is to submit a new application. See Getch, 539 F.3d at 484; Kapusta v. Sullivan, 900 F.2d 94, 97 (7th Cir. 1989).

---

[22]Plaintiff has not submitted additional records relating to the surgery to this court in support of a sentence six remand.

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **AFFIRMED**, and this case is

**DISMISSED**.  The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 31st day of January, 2010.


/s Lynn Adelman

_____
LYNN ADELMAN
District Judge